No. 79,164

TIMOTHY KENNEDY, *Appellant*, v. BOARD OF COUNTY COM-
MISSIONERS OF SHAWNEE COUNTY, KANSAS; VICTOR MILLER,
individually and in his official capacity as a Commissioner of
Shawnee County, Kansas; and DONALD COOPER, individually
and in his official capacity as a Commissioner of Shawnee
County, Kansas, *Appellees*.

(958 P.2d 637)

Opinion filed
April 24, 1998.

*William G. Haynes*, of Frieden, Haynes & Forbes, of Topeka, argued the cause
and was on the briefs for appellant.

*Laura M. Graham*, assistant county counselor, argued the cause, and *Sandra
L. Jacquot*, county counselor, was with her on the brief for appellee Board of
Shawnee County Commissioners.

*Anne Lamborn Baker* and *Thomas E. Wright*, of Wright, Henson, Somers, Sebelius, Clark & Baker, L.L.P., of Topeka, were on the brief for appellee Victor Miller.

*Ann L. Hoover*, of Bennett & Dillon, L.L.P., of Topeka, was on the brief for appellee Donald Cooper.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Timothy Kennedy appeals his removal from the office of Shawnee County Appraiser. The Director of the Property Valuation Division of the Kansas Department of Revenue (Director) upheld the removal as being for just cause. Kennedy appealed that decision to the district court and filed a separate lawsuit against individuals Donald Cooper and Victor Miller, who were county commissioners, as well as against the Board of County Commissioners of Shawnee County, Kansas, (Board) in which he raised constitutional issues—some cast as violations of 42 U.S.C. § 1983 (1994)—and contract issues, and alleged retaliatory discharge. In the district court, the two suits were consolidated. The district court affirmed the administrative decision and granted defendants' motions for summary judgment on all other issues. Kennedy appeals from both rulings. Kennedy's motion to transfer the appeal from the Court of Appeals to this court was granted.

The facts material to this appeal are not controverted. It is undisputed that Kennedy was appointed as Shawnee County Appraiser in August 1992. On January 4, 1993, the Board passed Resolution 93-1, stating that it desired to contract and reappoint Kennedy as county appraiser, pursuant to K.S.A. 19-430, for a 4-year term from July 1, 1993, through June 30, 1997. Newly elected County Commissioners Miller and Cooper were sworn in on January 11, 1993. Immediately, the Board passed Resolution 93-5, which repealed Resolution 93-1. In March 1993, the Board stated its resolve to search for a county appraiser for the 4-year term beginning July 1, 1993. The minutes of the Board for April 6, 1993, show that the majority approved a motion for "appointment of Tim Kennedy as Shawnee County Appraiser for four years." On May 27, 1993, the Board passed Resolution 93-72, terminating Kennedy

as county appraiser. The "Order of Termination" attached to Resolution 93-72 stated, in part:

"The reasons for your termination include but are not limited to the following: You have failed or neglected to properly perform the duties of the office. The general statutory duties are set forth in K.S.A. 79-1412a. Additional duties are set forth in the position description for Shawnee County Appraiser. This termination is for such failure or neglect and for other cause."

Also on May 27, 1993, the Board passed Resolution 93-71, rescinding the April vote to appoint Kennedy for 4 years. Additional facts will be stated as necessary to the discussion of particular issues.

We first consider the district court's affirmance of the Director's decision that Kennedy's termination was for just cause. Kennedy's removal from office was effected by the Board's passage of Resolution No. 93-72 on May 27, 1993. The order of termination was attached to the resolution. K.S.A. 79-1412a(a) provides:

"County appraisers and district appraisers shall perform the following duties:

*First.* Install and maintain such records and data relating to all property in the county, taxable and exempt, as may be required by the director of property valuation.

*Second.* Annually, as of January 1, supervise the listing and appraisal of all real estate and personal property in the county subject to taxation except state-appraised property.

*Third.* Attend meetings of the county board of equalization for the purpose of aiding such board in the proper discharge of its duties, making all records available to the county board of equalization.

*Fourth.* Prepare the appraisal roll and certify such rolls to the county clerk.

*Fifth.* Supervise the township trustees, assistants, appraisers and other employees appointed by the appraiser in the performance of their duties.

*Sixth.* The county appraiser or district appraiser in setting values for various types of personal property, shall conform to the values for such property as shown in the personal property appraisal guides devised or prescribed by the director of property valuation.

*Seventh.* Carry on continuously throughout the year the process of appraising real property.

*Eighth.* If the county appraiser or district appraiser deems it advisable, such appraiser may appoint one or more advisory committees of not less than five persons representative of the various economic interests and geographic areas of the county to assist the appraiser in establishing unit land values, unit values for structures, productivity, classifications for agricultural lands, adjustments for location factors, and generally to advise on assessment procedures and methods.

*Ninth.* Perform such other duties as may be required by law."

The Shawnee County Appraiser job description stated, in part:

" 'REQUIRED KNOWLEDGE, ABILITIES AND SKILLS:

'Comprehensive knowledge of real estate appraisal principles and practices: comprehensive knowledge of Kansas property tax law, regulations, and principles and practices.

'Ability to establish and maintain effective working relationships with taxpayers, state officials, other employees, and the general public; ability to establish and maintain required records and reports.' "

The findings of fact made by the administrative hearing officer with respect to Kennedy's failure to perform his administrative duties satisfactorily can be summarized as follows:

1. Kennedy failed to provide lease information requested by the Board of Tax Appeals (BOTA) that he had agreed, under oath, to provide.

2. Temporary employees were assigned by Kennedy to work on 1993 values without Board authorization for their performing that task.

3. Under Kennedy's watch, temporary employees rolled values over to 1993 based on 1992 hearing values that were rejected by BOTA pending hearing or receipt of further documentation.

4. Kennedy failed to take the steps necessary to obtain an order from BOTA authorizing 1992 values, which had been set pursuant to a payment under protest hearing, to be frozen or rolled over to 1993. The order was required by the Director, and Kennedy had been advised by the county counselor that it was a necessity.

5. Although Kennedy had not requested or received an extension of the May 20 statutory deadline, K.S.A. 1993 Supp. 79-1448, he directed a memorandum to be prepared and circulated on May 21, informing his staff that the deadline for completing informal decisions on taxpayer appeals was June 8, 1993.

6. Kennedy told county commissioners in February 1993 that the value of new construction would be included in valuation notices to be mailed in March. Kennedy sent a memorandum to Commissioner Miller identifying several parcels for which the value of new construction had not been added before valuation notices

were mailed. Records showed, however, that as of April 1993, there were 1,094 parcels on which 1992 building permits for new construction had been issued to which no value had been added. The task of picking up new construction continued into May 1993.

7. Kennedy requested and obtained an extension of the statutory deadline of March 1, K.S.A. 1993 Supp. 79-1460, for mailing valuation notices. When the notices were mailed on March 15, approximately 3,500 were erroneous and illegal.

8. Contrary to established practice, Kennedy instructed staff to use unvalidated sales in the valuation process.

9. Kennedy failed to forward files requested by the county clerk. Repeated attempts by the county clerk and her staff to resolve the problem were unsuccessful. Even when County Commissioner Cooper intervened, weeks passed without results.

10. "On April 8, 1993, BOTA Chairman Jack Shriver notified Kennedy the BOTA was concerned about Shawnee County protest justifications changing values recently established by the BOTA or District Court. Shriver also expressed the BOTA's concern that Shawnee County protest justifications lacked sufficient supporting documentation. Due to these problems, Shriver informed Kennedy the BOTA would set all Shawnee County protest justifications for hearing. . . .

. . . .

"On April 20, 1993, Kennedy sent Chairman Shriver what Kennedy admitted was a 'scathing' response to Shriver's April 8 letter."

On May 10, BOTA sent a list of over 600 rejected justifications to the county clerk and the Board. Only 23 were not attributable to Kennedy.

On May 14, Kennedy announced appointments to an Appraisal Advisory Committee. Because all appointees resided west of Topeka Boulevard, state and county lawmakers expressed concern that the advisory committee was not representative and not in compliance with K.S.A. 79-1412a *Eighth.*

11. The price for potential additional office space for the county appraiser furnished by Kennedy to Commissioner Cooper did not match the price given by a real estate broker to Commissioner Miller, from which Miller concluded that Kennedy misrepresented the cost.

12. There was at the very least an appearance of a conflict of interest in Kennedy's connection with Foxcross Associates before he became county appraiser and his agreeing to reduce valuations by significant amounts on Foxcross Associates property after he became county appraiser. In this regard, the administrative hearing officer found:

a. A March 1993 letter written to Commissioners Kingman and Cooper by attorney David Holstead "could reasonably be read as evidence Kennedy had been engaged by the Carpenter [law] firm to work on the Foxcross property" prior to his appointment as county appraiser.

b. Prior to being appointed county appraiser in August 1992, Kennedy testified at a May 1992 BOTA hearing on Foxcross Associates. He was introduced by Foxcross Associates' attorney Holstead as his witness who would " 'provide evidence concerning the Taxpayer's position on the value.' "

c. Kennedy did not include in a March 1993 list of former clients he prepared for Commissioner Miller either Foxcross Associates or the Carpenter law firm.

d. "On September 10, 1992, Kennedy, as Shawnee County Appraiser, signed stipulations reducing values on Foxcross Associates parcels from $507,100 to $300,386 and from $1,103,300 to $710,000." The stipulations were rejected by BOTA on the following grounds:

" '[T]he testimony of Tim Kennedy is not credible because he had been retained by the taxpayer to render an opinion of value for the subject property, just prior to becoming the Shawnee County Appraiser. Mr. Kennedy then rendered an opinion of value on the same property in support of the stipulated value as Shawnee County Appraiser. Mr. Kennedy also submitted a workup into evidence at the January 4, 1993 hearing that he had prepared as a tax consultant retained by the taxpayer in support of the stipulation he agreed to as Shawnee County Appraiser.' "

The district court determined that the "findings of fact in the August 9, 1994 Memorandum Opinion, Findings of Fact, Conclusions of Law and Order of Michael Barbara as Presiding Officer Acting on behalf of the Director of Property Valuation are supported by substantial evidence and are hereby affirmed." To what

the administrative hearing officer had said, the district judge added his observations that Kennedy failed to grasp that his duties as a county officer included functioning as a part of the county system rather than in an adversarial position. The judge noted that some of Kennedy's actions jeopardized the health and integrity of the county's tax base as well as taxpayers' opportunities to challenge valuations. In the judge's view, the appearance of a conflict of interest in favor of a developer, Kennedy's failure to be forthright about it, and his appointment of an advisory committee composed entirely of "persons with a 'westside' interest" combined to contribute to the fraying of "the only real important bond the county commission could enjoy with a county appraiser[,] which was one of trust in his office." The district court elaborated on this erosion of trust:

"Thus, though individually each of Mr. Kennedy's failures to perform according to statute or to cooperate with other public officials might seem not so egregious, nevertheless, given the complete and whole system upon which the valuation and taxation system operated and the importance of a forthright and competent appraiser to the system's proper functioning, his failures were critical to the maintenance of proper oversight and to instilling the necessary trust to enable the county commission, the Board of Tax Appeals, and other officials to effectively rely on his judgment as an essential county officer.

"Contrary to what his counsel asserts, the primary and fundamental qualification for any office holder is integrity and the maintenance of at least a minimal basis for trust and respect for the judgments made by that official. The record establishes clearly that Mr. Kennedy had substantially lost this fundamental and necessary base of trust in his judgment with those with whom and for whom he worked in the property tax appraisal system and accordingly, therefore, lost his ability to function as Shawnee County appraiser in the eyes of a majority of the Shawnee County Commission. The record supports this loss of trust for all the individual reasons stated which ultimately coalesced in the final judgment rendered by the commission majority.

"It was not necessary for the county to prove that Mr. Kennedy had in fact unjustifiably reduced valuations or acted out of partiality but rather only to prove his individual failures to comply with his duties which individual failures obviously led the majority of the commission to lose faith in his ability to fully and reasonably perform the duties of Shawnee County appraiser. The record as a whole supports not only the specific incidences of failure of duty but also the cumulative conclusion rendered by the Commission that Mr. Kennedy had accordingly 'failed and neglected to properly perform the duties of his office, by reasons of incompetence or other cause.' "

The principles governing judicial review are established by statute. In *Southwest Kan. Royalty Owners Ass'n v. Kansas Corporation Comm'n*, 244 Kan. 157, 164-65, 769 P.2d 1 (1989), this court stated:

"Under the Act for Judicial Review of Agency Actions, the party seeking change of an order has the burden of showing the district court that an agency's order is invalid for one of the following reasons:

. . . .

" '7. the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

" '8. the agency action is otherwise unreasonable, arbitrary or capricious.' K.S.A. 77-621(c).

"In determining whether the agency action is invalid for one of the foregoing reasons, the reviewing court must take into account the rule of harmless error. K.S.A. 77-621(d)."

"Arbitrary or capricious conduct may be shown where an administrative order is not supported by substantial evidence. [Citations omitted.] 'Substantial evidence' is evidence which possesses both relevance and substance, and which furnishes a substantial basis of fact from which the issues can be reasonably resolved. [Citation omitted.]" *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 365, 770 P.2d 423 (1989).

Neither the district court nor an appellate court may substitute its judgment for that of the administrative agency. *Pork Motel, Corp. v. Kansas Dept. of Health & Environment*, 234 Kan. 374, 382, 673 P.2d 1126 (1983). This court's responsibility is to determine if the district court reviewed the administrative decision in accordance with its statutory responsibility. *Shawnee Mission Med. Center v. Kansas Dept. of Health & Environment*, 235 Kan. 983, 989, 685 P.2d 880 (1984). So long as the record contains competent evidence in support of the decision, it must be upheld by this court. *Kansas Transport Co., Inc. v. State Corporation Commission*, 202 Kan. 103, 105, 446 P.2d 766 (1968).

Kennedy contends that the administrative hearing officer's findings of fact "are not supported by substantial evidence in light of the record as a whole and did not justify the vote to terminate

Kennedy." What Kennedy means by "the record as a whole" seems to be his version of the incident or conduct as well as the Board's version. In some instances, he seems to be asking this court to reweigh the evidence, which is not within the scope of review. In other instances, however, he endeavors to show that findings are not supported by substantial evidence.

As to the finding that Kennedy failed to provide lease information requested by BOTA, he contends that he "told the BOTA member he did not know whether any such leases existed but[,] if there were any, he would furnish them." There were no leases, he further contends, which explains why he furnished none. Kennedy's contention is not supported by the record. At the hearing before the administrative hearing officer, Kennedy testified, "Myra Gross asked me for leases, asked me if I had leases that I had used to compile the income analysis or to support the rents in the area, and I told her, *yes*, and to the extent we had them, I would send them to her." (Emphasis added.)

Kennedy implies that his use of temporary employees was necessary to his carrying out his duties of office. The hearing officer's findings in this regard were that Kennedy sought and obtained authorization from the Board to employ temporary workers "to complete 1991 and 1992 payment under protest [PUP] informal hearings," and that he used the temporary workers for other tasks. With respect to the rollovers, Kennedy's position seems to be that there is an unresolved legal issue as to whether the values could be rolled over "while BOTA was deciding whether to set them for hearing." He states that Commissioner Miller, who was qualified as an expert witness on the State's appraisal system, testified that he believed that PUP decisions were not final until approved by BOTA and that K.S.A. 1993 Supp. 79-1460 precluded their being rolled over. What Kennedy has presented to this court does not show a lack of substantial evidence supporting the hearing officer's findings on this point.

As to the May 21 staff memorandum, Kennedy quotes this portion of the memorandum in his brief:

"The deadline has been set for 93 informal decisions to be completed Tuesday, June 8th by 5:00 p.m. Pending decisions that are left to be made from the hearing

officers will be distributed according to neighborhood assignments for residential and land use code for commercial. We will try to get these out by 5:00 p.m. Monday, May 24th . . . ."

Kennedy's contention seems to be that the Board proved neither that recipients of the memorandum believed that they were being instructed to make informal decisions after May 20 nor that any informal decisions were made between May 20 and May 27, when Kennedy was removed from office. Proof of either, however, is unnecessary to the finding.

In response to Kennedy's failure to include the value of new construction in valuation notices to be mailed in March, he cites testimony of the Director to the effect that it would be possible to add the value of new construction up to June 15, when the county appraiser was required to certify the valuations. On this basis, Kennedy seems to be contending that the failure to include the value of new construction in the valuation notices mailed in March was inconsequential. With regard to his failing to do what he had told the Board would be done, he implies that the failure was not a reason given by the Board for removing him from office. He concedes, however, that Miller testified that he voted to terminate Kennedy due to his deceit.

Kennedy raises two points with respect to the approximately 3,500 erroneous notices. First, he asserts that the Director predicted in June 1992 that approximately 3,500 incorrect valuation notices would be mailed in March 1993. It could be inferred from such a prediction, made well before Kennedy was appointed, that he was not responsible for the erroneous notices. Kennedy, however, failed to supply a record reference for the prediction. Second, he cites testimony of David Galloway, who became the acting county appraiser after Kennedy was removed from office, seemingly for the purpose of showing that the erroneous notices resulted from shortcomings in the computer system. Kennedy also directs the court's attention to *Kansans for Fair Taxation, Inc. v. Miller*, 20 Kan. App. 2d 470, 472, 889 P.2d 154, *rev. denied* 257 Kan. 1092 (1995), in which Judge (now Justice) Larson described problems created by the computer system after the valuation notices were sent out in March 1993.

It is beyond question that the computer system caused its share of problems in the present case. Whether Kennedy is free of responsibility for the erroneous March 1993 notices is not clear from what has been presented to this court. Galloway testified with regard to the 3,500 erroneous notices, "[I]n comparison to the past, that wasn't really a great number." Establishing that the number of erroneous notices under Kennedy's supervision was not unusual goes a long way toward diminishing the significance of the hearing officer's finding on this point.

Responding to the finding that Kennedy instructed staff to use unvalidated sales in the valuation process, he asserts that Phillip Rice, who supervised data collectors for the appraiser's office, "testified that when Kennedy took office in August 1992, he instructed staff not to pick up new construction but the record is devoid of evidence Rice testified Kennedy instructed staff not to validate sales used in neighborhood analysis." Kennedy's assertion is inaccurate. The following questions were asked of Rice, and he gave the following answers:

"Q. When Mr. Kennedy started work out there in August of 1992, what was the nature of your job?

"A. I was supervisor of the data collectors.

"Q. What did you do in that position?

"A. I did the training, I did the quality control on their work when they were going out doing the sales verification, new construction or the relist of the properties.

"Q. What do you mean by sales verification?

"A. To go out and talk to the owners about whether the purchase price we had on our records was correct, and to measure the structures to see that they were all as they were the last time we were out there.

"Q. What do you mean by your reference to new construction?

"A. As building permits are taken out, they are put on where we can look to see what kind of new buildings are being put up in the county, and we would go out and measure and list those.

"Q. What do you mean by the reference to 25 percent relist?

"A. We are required to measure, to look at 25 percent of the properties every four years, and that's the 25 percent relist.

. . . .

"Q. Now when Mr. Kennedy took over as Shawnee County Appraiser, did your job change at all?

"A. Yes.

"Q.. How did it change?
"A. I was no long [*sic*] responsible to see that any of this work got done, in working with the data collectors.
"Q. What were your instructions?
"A. We were not going to pick up the new construction, *and we weren't going to work with sales at the time.*
"Q. Were you working the 25 percent relist?
"A. Yes, we weren't going to do that either." (Emphasis added.)

Kennedy's position on the appointments to the Appraisal Advisory Committee is that the appointments announced on May 14 were initial appointments, to be followed at some later date by additional ones that would "reach out to the entire community." In addition to his own testimony that his intent was to make the committee more representative by later adding members, Kennedy cites his May 14 memorandum for support. It is a memorandum to the appointees from Kennedy with copies to the county commissioners, which states in full:

"I want to thank you all for your commitments to Shawnee County in agreeing to serve on the Appraiser's Advisory Committee, and look forward to your input and participation.
"You will be notified within the next week of the date, time and agenda of the first meeting.
"Thanks again for your commitment."

What Kennedy has presented to this court does not show a lack of substantial evidence supporting the hearing officer's findings.

Kennedy explains that the price discrepancy on office space arose because the price he gave was for a "triple net lease." Examination of the memorandum reveals no explanation of the price. It is a four-page memorandum listing 15 potential office spaces and recommending a building on Wanamaker Road as "clearly the most desirable. In addition to having the lowest rent, it can be occupied immediately, is fully handicapped accessible, has adequate parking, is wired for the computer, has a phone system, and is accessible from all parts of the county."

Kennedy does not define a "triple net lease." Black's Law Dictionary 1040 (6th ed. 1990) defines a "net lease" as one requiring the tenant to pay insurance, taxes, and maintenance. If the prices Kennedy gave for the other 14 potential spaces were not on

the same basis, the memorandum and its conclusion could be misleading with regard to which property was "most desirable" as well as somewhat generally misleading by not specifying what the price per square foot did not include. Kennedy has not presented anything that would undermine the hearing officer's findings.

Finally, with respect to the conflict of interest finding, Kennedy states that he was never a paid consultant for either the Carpenter law firm or Foxcross Associates. This denial does not dispel the appearance of a conflict of interest.

Kennedy has the burden of showing that the agency's decision was invalid based on determinations of fact not supported by substantial evidence or that it was otherwise unreasonable, arbitrary, or capricious. He has failed to do so.

Kennedy also challenges the district court's interpretation of K.S.A. 19-431 and its conclusions that Kennedy had no enforceable agreement, express or implied, for employment as Shawnee County Appraiser for the 4-year term beginning July 1, 1993. K.S.A. 1997 Supp. 19-430(a) provides: "On July 1, 1993, and on July 1 of each fourth year thereafter, the board of county commissioners of each county shall by resolution appoint a county appraiser for such county who shall serve for a term of four years and until a successor is appointed." The statute in effect at the time Kennedy was employed as Shawnee County Appraiser was K.S.A. 1992 Supp. 19-430, which provided: "On January 15, 1977, and on July 1 of each fourth year thereafter the board of county commissioners . . . shall . . . appoint a county appraiser . . . who shall serve for a term of four years." It further provided that a vacancy was to be filled by appointment of the board of county commissioners "for the unexpired term and until a successor is appointed." The record shows that Kennedy was appointed to the position of Shawnee County Appraiser on August 11, 1992, to fill a vacancy for an unexpired term, or until June 30, 1993.

Kennedy contends that the Board had committed to appoint him as county appraiser for the 4-year term from July 1, 1993, to June 30, 1997. Kennedy has not challenged the district court's findings of fact that relate to this contention. The district court found the following:

"3. On January 4, 1993, the Board passed Resolution No. 93-1 announcing the Board's desire to contract with and appoint Tim Kennedy as County Appraiser for a term commencing July 1, 1993, and terminating June 30, 1997. . . .

"4. Victor Miller and Donald Cooper were sworn in as Shawnee County Commissioners on January 11, 1993. . . .

. . . .

"6. On January 12, 1993, the Board passed Resolution No. 93-5 which repealed Resolution No. 93-1. . . .

"7. On April 6, 1993, a majority of the Board voted in favor of a motion to appoint Tim Kennedy as Shawnee County Appraiser to the four-year term beginning July 1, 1993, and ending June 30, 1997."

At the Board's regular, public meeting of May 27, 1993, Cooper and Miller passed Resolution No. 93-72, which removed Kennedy from the position of county appraiser. The district court further found: "On May 27, 1993, the Board passed Resolution No. 93-71 rescinding the April 6, 1993, action taken regarding Tim Kennedy's appointment and declared the April 6, 1993, action null and void."

Based on the Board's actions with respect to appointing him for the 4-year term beginning July 1, 1993, Kennedy contends that he had an implied contract for that period. In the administrative proceedings, "Judge Barbara found . . . that [Kennedy] had no claim for the four-year term beginning July 1, 1993, as a matter of state law." The administrative hearing officer's conclusions of law included the following with respect to that four-year term:

"6. Appellant does not have any vested property right in the four (4) year term commencing July 1, 1993, because he was never duly appointed nor did he serve any time in the office during the four (4) year term. Until he was duly sworn and duly took office, which could not occur prior to July 1, 1993, Appellant had no employment contract with Shawnee County.

"7. Appellant is not entitled to a due process hearing under K.S.A. 19-430 or K.S.A. 19-431. He was not terminated from the four (4) year term. He was never appointed, nor has he served any time as county appraiser for the four (4) year term. The right that Appellant has to a due process hearing on the unexpired term is afforded him under the above statutes because at the time of his termination from the unexpired term, he . . . had been duly appointed, sworn, and was serving as the county appraiser.

"8. K.S.A. 19-430 is clear and unambiguous in that the appointment of a county appraiser must be made as of July 1, 1993, and cannot take effect prior to July 1. Thus, no appointment was made herein."

In the appeal of the administrative decision, the district court agreed that "Kennedy's claim to a second term beginning July 1, 1993, was as a matter of state law foreclosed to him and consequently not properly a part of the K.S.A. 19-431 proceedings."

The district court set out the following reasoning and conclusion that Kennedy did not have an implied contract and, in fact, never had more than an expectation for employment for the term beginning July 1, 1993:

"The statutory scheme established by K.S.A. [19-430] *et seq.* by its very existence, precludes any belief that implied claim to hold the office of county appraiser can exist. The very oxymoron of the legal dilemma were the fact otherwise, as suggested by the question noted here, gives emphasis to a legislative intent that precludes such a claim by language mandating, absent a vacancy, July 1, as the actual date for acting to effectuate the appointment that to [*sic*] office for a new term. Heretofore, the statutory date set for such an appointment had been January 15th. (See, L. 1993, Chap. 282, Sec. 1). By extending the date for appointment to July 1 of an appropriate year, given the staggered terms of county commissioners and the January date for the beginning of their terms of office (K.S.A. 19-202), extending the appointment date to July 1 of the year can be seen to give new commissioners an opportunity to have experience with a county appraiser before the end of his or her term, thus dampening any political propensity that might exist to immediately terminate an unpopular appraiser upon the seating of new county commissioners. Obviously, by establishing the safeguard of a term and a review proceeding under the auspices of the Property Evaluation Director over whom county commissioners have no control, county appraisers were further insulated from the fluctuating whim of politics or personality. Thus, by the combination of a specific date for a county commission to act to effectuate an appointment, the provision for a term of office, and an appeal process protecting the appointee during his or her term, it seems that reasonably the legislative intent was to establish the exact manner by which the position both may be filled and exited, precluding, therefore, any implied basis to either obtain it or leave it other than by the terms of the statute. Thus, considering such claim raised anew here, the Court independently adopts the reasons stated in 94-CV-1040 by this Court and Judge Barbara in now finding the plaintiff states no claim for the term of office beginning July 1, 1993, as a matter of state law."

With regard to why constitutional contentions Kennedy made for the term beginning July 1, 1993, lacked merit, the district court stated:

"The effect of this finding is, as well, to exclude Mr. Kennedy's 42 U.S.C. 1983 claim in regard to any absence of separate due process procedures that might

arguably relate to the separate action of the Shawnee County Commission taken on May 27, 1993, whereby the Commission rescinded Mr. Kennedy's appointment for the term beginning July 1, 1993. (Resolution 93-71). What 'property' rights exist in a particular state employment is a question of state law. (*Board of Regents v. Roth*, id., 408 U.S., at 577, 33 L. Ed. 2d, at 561). As such, since Mr. Kennedy, as a matter of state law, had no entitlement, express or implied, to be Shawnee County Appraiser until appointed according to law pursuant to K.S.A. 19-430, or at least until entering upon such term, he had no 'property interest.' Equally any 'liberty interest' claim relating to this term of office for which he had no entitlement has no linchpin upon which to rest, and accordingly, his liberty claim, standing alone, should fail to state a claim for which relief can be granted under his 42 U.S.C. 1983 claim. See, *Paul v. Davis*, 424 U.S. 693, 47 L. Ed. 2d 405 (1976).

"Further, even if a 'liberty interest' claim survived as to the July 1, 1993, term of office because it was 'entangled' with his termination (*McGhee v. Draper*, 639 F.2d 639 (10th Cir. 1981), the same grounds, in fact, unquestionably underlaid both his termination from the term ending June 30, 1993, and the recision of his appointment for the term beginning July 1, 1993. A full name clearing proceeding was held by way of the K.S.A. 19-431 proceeding. Full discovery was had of the reasons. The opportunity to 'clear his name' was just as effective constitutionally by one proceeding as by two to satisfy his liberty interests under either posture for his claim. Further, even if the K.S.A. 19-431 proceedings were somehow deficient, the absence of stigmatizing allegation attending Mr. Kennedy's leaving of office precludes such a claim. Certainly, neither the county resolution terminating him nor the county resolution rescinding his appointment for the July, 1993, term are, in their text, stigmatizing. See, *Conway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988); *Paul v. Davis*, id. At best, information that could be said to be stigmatizing would have only developed during the hearing and would provide no basis for a liberty interest claim. See, *Bishop v. Wood*, [426 U.S. 341 (1976)]. Although Mr. Kennedy does make allusion to private statements of Mr. Miller and Mr. Cooper to the media that he claims categorized him as dishonest (See, Plaintiff's Response, Exhibit A: Affidavit of Tim Kennedy, at page 7, No. 26), these statements are not advanced here nor tied-in as a consequence from the fact of his termination or the recision of his appointment. If such facts existed and were material, the duty was to advance them here. See, *Crooks v. Greene*, [12 Kan. App. 2d 62 (1987)]."

In conclusion, the district court stated that because "Kennedy was never effectively appointed to the four-year term of office beginning July 1, 1993, he was not entitled to a due process hearing pursuant to the provisions of K.S.A. 19-431 nor entitled to any salary or benefits in connection with the term of office beginning July 1, 1993."

In this appeal, Kennedy contends that the Board had the authority to agree to continue his employment for the term beginning July 1, 1993, and that it entered into either an expressed or implied contract with him to do so. His argument is comprised of nothing more than the bare assertion—he offers no suggestions for contravening the conclusions of the administrative hearing officer and the district court or for contriving an alternative rationale. He does, however, cite a number of cases.

For the proposition that the Board had authority to agree to continue his employment, Kennedy invites the court to compare *Edwards County Comm'rs v. Simmons*, 159 Kan. 41, 151 P.2d 960 (1944), with the present case. The primary question in *Edwards County* was whether the contract—a contingency fee agreement—entered into by the county board in 1931 and under which Simmons performed services during the years that followed was valid and binding on subsequent boards. Attorneys J. S. Simmons and Harold Fatzer represented Edwards County in Reno County District Court on a tax claim against a railroad. A sizeable settlement was paid directly to the attorneys, who subtracted their fee from it before paying the balance to the county. There was

"no contention . . . made that a contract was not entered into by a prior board with defendant Simmons nor that Simmons did not render legal services under the contract over the many years involved, nor is it contended that defendant Fatzer did not render legal services for the county outside of the county in assistance to Simmons." 159 Kan. at 43.

The court examined pertinent case law at length, concluding that the issue had to be decided on a case-by-case basis. It stated:

"[T]he test generally applied is whether the contract at issue, extending beyond the term, is an attempt to bind successors in matters incident to their own administration and responsibilities or whether it is a commitment of a sort reasonably necessary to protection of the public property, interests or affairs being administered. In the former case the contract is generally held to be invalid, and in the latter case valid." 159 Kan. at 54.

The court found that the board's contract with Simmons was of the latter type:

"The board was acting under a statute authorizing intervention in receivership proceedings. Certainly it cannot reasonably be said that attorneys employed for

such purpose lose all authority to act the moment the term of the contracting board expires, regardless of the status of matters pending in the receivership action. The most that could possibly be said to the contrary is that the incoming board would have power to terminate the contract.

"In *Smith v. Cunningham*, 59 Kan. 552, 53 Pac. 760, it was said:

'In regard to the relation of attorney and client it may be said that the attorney's authority to act for his client continues until the end of the litigation, or until the discharge of the particular purpose for which he was.employed, unless his authority is sooner revoked.' (p. 554.)" 159 Kan. at 54.

Given that the primary question in *Edwards County* was whether a contract survives a change of elected officials, its relevance for the present case would be to the question of whether Resolution 93-1 was binding on the county commissioners sworn in the following week. If the newly sworn-in board had not taken steps to revoke it, whether Resolution 93-1 was binding on the subsequent board might be of some interest. The subsequent board, however, did revoke the resolution, and there is every indication in *Edwards County* that it had the authority to do so. By extension, the Board that was sworn in in January 1993 also would have the authority to revoke or terminate a contract of its own making. Thus, even if it could be said that the motion passed by the Board on April 6 gave rise to a contract with Kennedy for the 4-year term beginning July 1, the Board's action of May 27 would have revoked it.

Also for the proposition that the Board had authority to agree to continue his employment, Kennedy cites a number of other cases. Examination of those cases reveals none that offers any more support for his position than *Edwards County* does. In fact, in *State, ex rel., v. Wyandotte County Comm'rs*, 131 Kan. 747, 748, 293 Pac. 525 (1930), the court quoted the following:

" 'The board of commissioners of a county, about to be dissolved under operation of law, has no power to enter into a contract designating the official newspaper of the county and providing for the county printing for another year, so as to tie the hands of the new board, about to meet and organize, and thereby prevent the new board from selecting the official paper and contracting for county printing for the current year after its organization.' " (Quoting *Comm'rs of Coffey Co. v. Smith*, 50 Kan. 350, 32 Pac. 30 [1894]).

The other proposition put forward by Kennedy is a compound one, stated as follows in his brief: "The offer to continue Kennedy's employment for the 4-year term beginning July 1, 1993, authorized by Resolution 93-1, accepted by Kennedy, was either an expressed or implied contract to continue Kennedy's employment through June 30, 1997, creating a 'property right' to the second 4-year term of office subject to due process protection." The Kansas cases he cites in support are employment contract cases. *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 815 P.2d 72 (1991); *Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841 (1987); and *Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, 684 P.2d 1031 (1984). Each of these cases represents an installment in the development of various theories that have relaxed the former strict adherence to the employment-at-will doctrine in the courts of this state. In *Brown*, the court concluded that sufficient evidence of an implied contract of employment existed in the personnel manual plus testimony about the employer's philosophy and practice to submit the question to the jury. 249 Kan. at 138-39. In *Morriss*, the court concluded that summary judgment was improper where the personnel manual plus verbal and nonverbal conduct of the employer's supervisors and the employer's policies in dealing with its employees were sufficient to raise a genuine issue of material fact with respect to an implied contract. 241 Kan. at 513-14. In *Allegri*, the Court of Appeals concluded that summary judgment was improper where the employee handbook plus favorable evaluations and salary increases, an administrator's statement that Allegri could work until retirement, and his accommodating the employer's needs constituted sufficient evidence to require the matter to be submitted to a jury. 9 Kan. App. 2d at 664. There is nothing comparable in any of these cases to the appointment of a county appraiser pursuant to K.S.A. 1997 Supp. 19-430 or his or her removal pursuant to K.S.A. 19-431. Under the statutory scheme, a county appraiser is appointed for a 4-year term beginning on a certain date, and there is no provision for continuing employment short of reappointment at the beginning of the next 4-year term. The hallmark of the circumstances of *Brown*, *Morriss*, and *Allegri* in which the court concluded an implied con-

tract might be found was ongoing employment. The position of county appraiser, in contrast, is defined by the statutory 4-year terms. An implied contract of employment in that circumstance would be for the term. If, as Kennedy seems to argue, there were to be an implied contract for a next term, it would be a completely different species of contract from the ones described in *Brown*, *Morriss*, and *Allegri*.

The federal district court cases cited by Kennedy are in the same category with the Kansas cases. Kansas law is applied in each, and the analysis involves ongoing employment.

In the present case, Kennedy's expectations of reappointment arguably were fostered by the county commissioners on two occasions—the passage of Resolution 93-1 on January 4 and the passage of a motion on April 6. The resolution was passed by an outgoing county commission. It amounted to a gesture that could mean only that if the outgoing Board had the authority to bind the incoming Board, it would do so by reappointing Kennedy for the term that would begin 6 months hence. Even if Kennedy had misinterpreted the gesture, his expectation of being reappointed would have been rectified when the incoming Board immediately rescinded Resolution 93-1. The Board that passed a motion on April 6 for "appointment of Tim Kennedy as Shawnee County Appraiser for four years," in contrast to the Board that passed Resolution 93-1, by virtue of being the Board that would hold office on July 1, 1993, actually did have authority to reappoint Kennedy on that date. It did not have authority to do so in April, however. The statute provides for appointment or reappointment by resolution on July 1, 1993. No other means is available under the statute. Nor is any provision made for a county commission's committing itself in advance of the appointment date to appointing or reappointing a particular person on July 1. In these circumstances, any expectation Kennedy might have had of having his appointment renewed on July 1 was a mere subjective expectancy. In *Perry v. Sindermann*, 408 U.S. 593, 603, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972), the United States Supreme Court made clear that "a mere subjective 'expectancy' " is not protected by procedural due process. On May 27, 1993, the Board passed Resolution 93-72, terminating

Kennedy as county appraiser, and on the same day the Board revoked its action of April 6. By these actions, the Board quashed even the subjective expectancy Kennedy might have had.

K.S.A. 1997 Supp. 19-430 gives no indication that a person appointed as a county appraiser has any expectation of being appointed for a succeeding term. The current statute, which does not vary in any material measure from the version in effect at the time of Kennedy's suspension, provides, in part:

"On July 1, 1993, and on July 1 of each fourth year thereafter, the board of county commissioners of each county shall by resolution appoint a county appraiser for such county who shall serve for a term of four years and until a successor is appointed. . . . No person shall be appointed or reappointed to or serve as county appraiser in any county under the provisions of this act unless such person shall have at least three years of mass appraisal experience and be qualified by the director of property valuation as an eligible Kansas appraiser under the provisions of this act. . . . No person shall be appointed to the office of county or district appraiser or to fill a vacancy therein unless such person is currently: (1) A certified general real property appraiser pursuant to article 41 of chapter 58 of the Kansas Statutes Annotated and amendments thereto; (2) a registered mass appraiser pursuant to rules and regulations adopted by the secretary of revenue; or (3) holding a valid residential evaluation specialist or certified assessment evaluation designation from the International Association of Assessing Officers. Notwithstanding the foregoing provision, any person who holds the office of county or district appraiser on the effective date of this act and who is not eligible for reappointment pursuant to this section shall be eligible for reappointment to such office or appointment as a county or district appraiser in another county for a term expiring on July 1, 1999, and if any such person qualifies for an original appointment or reappointment prior to July 1, 1999, such person may be reappointed for a full term, and any other person who has at least three years of mass appraisal experience and is qualified by the director of property valuation as an eligible Kansas appraiser shall be eligible for appointment to such office for a term expiring on July 1, 1999, and if any such person qualifies for an original appointment prior to July 1, 1999, such person may be reappointed for a full term." K.S.A. 1997 Supp. 19-430(a).

There is nothing in the statute that supports a·claim of entitlement to a renewed appointment.

K.S.A. 19-431 governs removing a county appraiser from office. Subsection (a) provides, in part:

"Whenever it shall be made to appear to the board of county commissioners of any county . . . by evidence satisfactory to such board that the appraiser of such

county . . . has failed or neglected to properly perform the duties of office, by reasons of incompetency or for any other cause, the board shall enter upon its journal an order suspending or terminating the county . . . appraiser from office. Such order shall state the reasons for such suspension or termination, and upon the service of any such order upon the appraiser suspended or terminated such appraiser shall at once be divested of all power as county . . . appraiser and shall immediately deliver to the person appointed to discharge the duties of the office of such appraiser, all books, records and papers pertaining to the office. The board of county commissioners . . . shall appoint a temporary appraiser to discharge the duties of the office until the suspension is removed or the vacancy filled, and the person so appointed shall take the oath of office required by law and thereupon such person shall be invested with all of the powers and duties of the office.

"Within 15 days after service of an order of suspension or termination, the appraiser may request a hearing on the order before the director of property valuation. Upon receipt of a timely request, the director of property valuation shall conduct a hearing in accordance with the provisions of the Kansas administrative procedure act. . . . At the hearing the director of property valuation shall make inquiry as to all facts connected with such suspension or termination, and if after such inquiry is made the director of property valuation shall determine that the appraiser suspended should be removed permanently and such appraiser's office declared vacated or should be terminated, then the director of property valuation shall render an order removing such appraiser. A copy of such order, duly certified and under the seal of the director of property valuation, shall be sent to the board of county commissioners or district board employing such appraiser who shall cause the same to be recorded in full upon the journal of the board. Immediately upon the service of such order by the director of property valuation such office of appraiser shall be vacant, and the board of county commissioners or district board shall appoint an eligible Kansas appraiser as appraiser to fill such vacancy, who shall qualify as provided by law in such cases. Should the person appointed be other than the person appointed to discharge the duties of the office temporarily, the person discharging the duties of the office temporarily shall immediately transfer to the person appointed to fill the vacancy all the books, records and files of the office."

The United States Supreme Court has held that tenured public employees have a property interest in continued employment that is protected by the Due Process Clause. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985). Kennedy contends that K.S.A. 19-431 does not satisfy due process requirements and that he was not afforded due process by the hearing held pursuant to K.S.A. 19-431.

"The basic elements of procedural due process of law are notice and an opportunity to be heard at a meaningful time and in a

meaningful manner. [Citation omitted.]" *In re Petition of City of Overland Park for Annexation of Land*, 241 Kan. 365, 370, 736 P.2d 923 (1987). The question of what process is due in a given factual situation under the Due Process Clause of the United States Constitution is a legal one. See *Murphy v. Nelson*, 260 Kan. 589, 594, 921 P.2d 1225 (1996). The constitutional shortcomings of K.S.A. 19-431 are, according to Kennedy, that it "fails to require notice of specific reasons for a proposed termination with an opportunity to be heard *prior* to removal [of the county appraiser] from office by the county commission." Kennedy misreads the statute with regard to notice. The statute expressly and clearly requires the Board's order terminating the county appraiser to "state the reasons" for the termination. With regard to an opportunity to be heard, the statute provides for a hearing after suspension or termination with the possibility of reinstatement in the event that the Director of Property Valuation concludes that the appraiser should not be terminated.

The district court heeded the principle often repeated by this court:

"If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. . . . This court not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute." *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, Syl. ¶ 2, 930 P.2d 1 (1996), *cert. denied* 137 L. Ed. 2d 1029 (1997).

The district court construed removal from office under K.S.A. 19-431 as suspending rather than terminating a county appraiser and suspension as not affecting salary and benefits. The court stated:

"(e) K.S.A. 19-431 authorizes the commissioners to enter an order terminating an appraiser upon a finding the appraiser failed or neglected to properly perform the duties of office. Upon timely request for a hearing, such an order of the commissioners is subject to review by the Director of Property Valuation. If the appraiser properly requests a hearing within 15 days, the appraiser is then effectively suspended and prohibited from the exercise of the duties of the office of the county appraiser. However, the order of the commissioners terminating such appraiser is not final or effective to terminate the salary and benefits due such county appraiser or to create a permanent vacancy until the director of property

valuation finds the appraiser was properly removed and terminated for just cause. . . . K.S.A. 19-431 is properly and constitutionally effective to divest a county appraiser by resolution duly enacted by the county commission from the powers of his office such that an acting county appraiser can be appointed to continue the duties of the office pending appeal. An individual office holder has no personal vested interest nor entitlement to the actual exercise of the duties of his office that deserves constitutional protection. This is particularly so here since the procedure prescribed by K.S.A. 19-431 permitting removal and the appointment of a temporary successor pending a hearing constitutes part of the conditions of office and are properly controlled by the statute creating the office. The appraiser has no standing to complain of the non-exercise by him personally of the duties of county appraiser pending his hearing. As such, the hearing intended by K.S.A. 19-431 and the Kansas Administrative Procedures Act was constitutionally adequate and provided Tim Kennedy a full and fair forum to adjudicate the propriety and lawfulness of his termination as a matter of fact and law."

In order to restore salary and benefits to Kennedy, the district court included the following provisions in its memorandum opinion and entry of judgment:

"(f) On May 27, 1993, the commissioners entered an order finding that Kennedy failed or neglected to perform the duties of his office and terminating Kennedy from the remainder of his term of office. The order was properly appealed to the Director of Property Valuation, who upheld the order of termination on August 9, 1994, after a full hearing. As a result, notwithstanding the adequate legal and factual basis for his termination, Mr. Kennedy is entitled to the salary and benefits that accrued to him for his term of office as county appraiser through June 30, 1993, pursuant to the principles announced in *Wertz v. Southern Cloud Unified School District*, [218 Kan. 25] (1975) and *Cleveland Board of Education v. Loudermill*, [470 U.S. 532 (1985)].

"(g) As such, and pursuant to K.S.A. 19-431, the action taken by the commissioners on May 27, 1993, was not final until approved by the Director of Property Valuation or his designee. As noted, the commissioners had the authority under K.S.A. 19-431 to remove Kennedy from the performance of the duties of his office during the time this matter was on appeal to the Director of Property Valuation, however, because the Director of Property Valuation did not reach a decision upholding the termination until after Kennedy's term of office expired on June 30, 1993, K.S.A. 19-431, being constitutionally construed to constitute a suspension [with] pay in the absence of a pretermination hearing, provides the basis for Kennedy to receive salary and benefits for the period of May 27, 1993, through June 30, 1993, inclusive."

As a result of the district court's reasoning and remedy, the May 27, 1993, resolution and order of the county commission deprived

Kennedy of no constitutionally protected interests. Thus, in due process terms, it may be said that no predeprivation hearing was required at that time. When the term of office expired June 30, 1993, Kennedy had no continuing constitutionally protected property interest in the position of county appraiser. We find the district court's reasoning to be sound and conclude that the due process requirements were met by the post-suspension hearing conducted by Michael Barbara as designee of the Director.

Finally, we consider Kennedy's claim relative to his April 20 letter to Chairman Shriver. A public employee in Kennedy's situation nonetheless may establish a claim to reinstatement if the decision not to renew his appointment was made by reason of his exercise of constitutionally protected First Amendment freedoms. *Perry v. Sindermann*, 408 U.S. at 597-98. In Kennedy's petition in the district court that raised issues other than those connected to appeal of the administrative decision, he alleged retaliatory discharge. His theory was that he had "suffered a retaliatory discharge because he was terminated for making a statement protected by the First Amendment." The district court treated this count as a "claim that he was terminated from his position as Shawnee County Appraiser for the term ending June 30, 1993, for the exercise of his First Amendment right of freedom of speech."

In *Copp v. Unified School Dist. No. 501*, 882 F.2d 1547, 1551-52 (10th Cir. 1989), one of the cases relied on by Kennedy, the federal appellate court concisely stated the appropriate analysis:

"In order to prevail on his speech claim, plaintiff must satisfy a three-prong test established by the Supreme Court in *Mount Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). Under *Mount Healthy*, an employee challenging an adverse employment decision initially must show that, as a matter of law, his speech deserves constitutional protection. *Id.* at 284, . . . Once the court determines that the speech is worthy of protection, the employee must prove as a factual matter that the protected speech was a substantial or motivating factor in the adverse employment decision. *Id.* at 287, . . . The burden then shifts to the employer to show 'by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct.' *Id.*; *see also Saye v. St. Vrain Valley School Dist. RE-1J*, 785 F.2d 862, 865-66 (10th Cir. 1986).

"The first prong of *Mount Healthy*, whether speech is constitutionally protected, necessarily involves the two-part test articulated in *Pickering v. Board of*

*Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35, 20 L. Ed. 2d 811 (1968): (1) whether the speech comments on a matter of public concern; and (2) whether the employee's interest in making such statements outweighs 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' "

Whether the speech has protected status is a question of law. *Riddle v. City of Ottawa*, 12 Kan. App. 2d 714, 720, 754 P.2d 465, *rev. denied* 243 Kan. 780 (1988). Thus, this court makes an independent judgment as to whether the statements at issue are constitutionally protected. See *Gillespie v. Seymour*, 250 Kan. 123, Syl. ¶ 2, 823 P.2d 782 (1991).

On the question of whether the letter commented on a matter of public concern, the district court noted that the letter was not free of Kennedy's personal grievances and its tone was defensive, but that the greater portion of its contents centered on tax matters of public concern. The district court concluded that the letter

"contained materials which, though of public concern, were in the time, manner, and place presented, overly disruptive to working and systemic relationships, particularly his so-called 'admission against interest' as noted by Commissioner Cooper. Mr. Kennedy's interests in speaking on these matters in the forum of that letter were outweighed by the County Commission's interest in promoting the efficient and effective operation of its appraisal function and services to the degree that a reasonable county commissioner could believe the speech at issue so reflected on the capacity of the officeholder to perform his duties that the act of sending that letter would support termination, notwithstanding the First Amendment."

As very ably observed by the district court, the revenue from property tax is critical to a county's stability, and close working relationships between and among the county appraiser, the county clerk, the county commission, and BOTA are needed to ensure its flow. Kennedy criticized his predecessors in the position of county appraiser, the Board, BOTA, and Chairman Shriver. Kennedy excepted himself from blame. He accused BOTA of being derelict in performance of its duties to taxpayers and questioned the legitimacy of its decisions in property valuation hearings. He stated that Shawnee County's valuations lacked justification, thereby undermining pending appeals. In the view of the district court, even if some discussion of these matters might have been called for in

conjunction with efforts to eliminate problems, the time, manner, place, and tone of the letter were unsuitable for that purpose. The district court stated that Kennedy, by his letter,

"jeopardized necessary working and systemic relationships between the county appraiser's office, the County Commission, and the Board of Tax Appeals. Further in selecting this format and forum to challenge the authority and ability of others, he further undercut Shawnee County in pending appeals and undermined his own credibility as an independent professional appraiser and public official."

Having concluded that the letter was not worthy of constitutional protection, the district court did not need to carry its analysis further. However, the district court did continue the three-prong test:

"Here, the Defendants have specified the reasons for Mr. Kennedy's termination in their statement of facts and they stand materially uncontroverted, none of which cite as a reason, the April 20, 1993, letter . . . . Certainly, no evidence elevates the letter to material status, much less 'motivating' status. Particularly, the Plaintiff has failed to come forward and identify facts that could reasonably reflect the letter was a 'motivating' factor for Mr. Kennedy's termination. Although, to Commissioner Cooper, sending the letter may have been one incident, within the smorgasbord of incidences, shaping his view of Mr. Kennedy's competence and professionalism, there is no basis in the evidence to tap it as a reason, much less a motivating factor, in Mr. Kennedy's termination.

"The Plaintiff, Mr. Kennedy, had the burden to come forward with evidence, direct *or* circumstantial, that minimally could lead to an inference that the letter at issue was a motivating factor and that the reasons actually advanced for his termination were spurious, trifling, or without factual support. This he has materially failed to do, thus casting his claim that this letter was a motivating reason as wholly one for speculation and surmise, and therefore an issue appropriate for summary judgment. See *Ware v. Unified Sch. D. 492, Butler County, Kansas*, 881 F.2d 906, 911 (1989); *Mount Healthy City Board of Ed. v. Doyle*, id.

". . . It took two votes on the County Commission to terminate Mr. Kennedy. The articulated reasons given by the two commissioners voting in the majority, standing materially uncontroverted . . . , have stature here as sufficient, facially rational, unrebutted independent reasons for termination. The result is there is a void in the record on this issue and the void was the responsibility of Plaintiff to fill and no other. As such, Mr. Kennedy's claim that he was terminated because of his speech fails since the speech, even if it was protected, has not been shown to be a motivating reason for his termination as a matter of law."

We conclude as follows: The findings of fact by the presiding officer acting on behalf of the Director are supported by substantial evidence, and just cause existed for termination of Kennedy as

Shawnee County Appraiser. The appointment and termination or suspension of a county appraiser is controlled by statute, and there exists no independent basis for Kennedy's claim of expressed or implied contract for employment as county appraiser for the term commencing July 1, 1993. Thus, Kennedy has no liberty or property interest in the term commencing July 1, 1993. Under K.S.A. 19-431, the order of termination was effective as a suspension with full benefits pending a hearing on the order before the Director, and Kennedy's letter to Chairman Shriver was not constitutionally protected speech nor was the letter shown to be a substantial or motivating factor for termination of Kennedy from the office of county appraiser. There are no material disputed facts which preclude summary judgment, and we affirm the district court.

Affirmed.