NOT DESIGNATED FOR PUBLICATION

No. 118,014

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
J.C.-G., a Minor Child.

MEMORANDUM OPINION

Appeal from Ellis District Court; GLENN R. BRAUN, judge. Opinion filed June 8, 2018. Affirmed.

*Richard A. Buck*, of The Law Office of Richard A. Buck, LLC, of Salina, for appellant.

*Charlene Brubaker*, assistant county attorney, for appellee.

Before GARDNER, P.J., PIERRON, J., and WALKER, S.J.

PER CURIAM: In December 2015, the State filed a petition alleging that J.C.-G. was a child in need of care (CINC). The State claimed that Mother had left him in the care of T.H. and her husband D.H. for long periods of time beginning in January 2014. This was the fourth CINC petition filed for J.C.-G. in which allegations revolved around Mother's instability and her inability to care for a child with special needs. Mother's and J.C.-G.'s mental health providers testified thoroughly about Mother's mental health history and J.C.-G.'s needs for consistency and stability. The district court terminated Mother's parental rights to J.C.-G. Mother appeals claiming a violation of her constitutional rights and that the court abused its discretion. We affirm.

Prior to this case, the State had filed three CINC petitions concerning J.C.-G. The first petition filed in March 2009 originated from a report by J.C.-G.'s maternal grandmother requesting that the Hays Police Department (HPD) conduct a welfare check on Mother and four-month-old J.C.-G. Grandmother reported that Mother had been

1

diagnosed with bipolar disorder and was experiencing a downturn in her cyclical behavior. Mother admitted to HPD officers that she was stressed to the point of forgetting to give J.C.-G. his medications at times, which could cause him to have a seizure. The State noted it had filed five care and treatment cases against Mother in which she had been involuntarily committed to Larned State Hospital (Larned) for evaluation and stabilization. Mother entered a no contest statement and J.C.-G. was adjudicated as a CINC. Following the adjudication, Mother worked with her mental health providers and was able to achieve reintegration with J.C.-G.

The second CINC petition was filed on May 20, 2014. Allegations again revolved around Mother's mental health issues, with the most recent care and treatment case having been filed May 6, 2014. T.H. had been taking care of J.C.-G. for most of the few months before the petition was filed. Mother and T.H. met in January 2014 at the Learning Center. Mother originally asked T.H. to babysit J.C.-G. on Fridays. After approximately one month of Fridays, Mother asked if J.C.-G. could stay overnights on weekends so that she could pick up extra shifts at work. Soon after, he began staying with T.H. for weeks at a time and then most of March and April 2014. T.H. reported that J.C.-G. had multiple diagnoses requiring medication and although Mother had provided medications, she had not provided them in the original containers or with any instructions. T.H. did not know if the medications were actually J.C.-G.'s or any dosage information. Mother failed to provide J.C.-G.'s other medical equipment as he requires a protective helmet and medical magnet to help with his seizures. J.C.-G.'s school had expressed concerns that his behavior and performance had steadily decreased until he was placed with T.H. The school reported that J.C.-G. had a lot of needs, and it did not believe Mother was able to care for him as she apparently did not recognize when he had a seizure in front of her until staff assisted him. Mother entered a no contest statement and J.C.-G. was adjudicated as a CINC. Mother again worked with her mental health providers and was able to work toward reintegration. The case was dismissed in August 2014.

The third case originated from T.H.'s report to the State about Mother's ability to care for J.C.-G. The State noted it had filed seven care and treatment petitions concerning Mother over a 10-year period. T.H. reported that after J.C.-G. was returned to Mother's care in the 2014 CINC case, she did not hear from Mother until December 2014. Mother asked for $300 so she could stay out of jail and offered to return J.C.-G. to T.H. in return. T.H. declined.

In January 2015, Mother called, claiming she had gotten her "act together." At the end of the month, she asked T.H. to take J.C.-G. for the weekend so she could move. He stayed the weekend of February 8, 2015 with T.H. She then had him the majority of March and April. In May 2015, Mother moved to Colorado. She and T.H. agreed to have J.C.-G. remain with T.H. until the end of the school year. However, on May 27, 2015, the State filed the third CINC petition regarding J.C.-G. In June, T.H. was notified that a hospital in Colorado reported Mother to law enforcement and they threatened to remove J.C.-G. from Mother. J.C.-G. had been with T.H. at that time, and the State placed him in police protective custody with her for the duration of that case. In July 2015, the State dismissed the case after T.H. and Mother agreed to co-parent J.C.-G. Because Mother was homeless at the time, J.C.-G. remained with T.H. for two more months, staying with Mother for only two days before returning to T.H.

On November 2, 2015, Mother moved from Hays to Salina and enrolled J.C.-G. in school there. T.H. obtained a see through backpack to act as his medical bag, containing his six medications for his seizure disorder, autism, and ADHD, each of which require medications as prescribed. J.C.-G. returned to Mother's care on November 14, 2015. He returned to T.H.'s home from November 25, 2015 through November 30, 2015, for Thanksgiving break. Mother only provided three medications. She reported the school had two of the medications and she had spilled the other. Because she was unable to get more at the time, J.C.-G. had to go without.

3

Within a week of J.C.-G.'s return to Mother, she called T.H. to pick him up because she was returning to inpatient care. She asked T.H. to keep J.C.-G. until the start of the Spring 2016 school semester. At the time the CINC petition was filed, J.C.-G. had not been re-enrolled in school in Hays, but was permitted to attend because he was in T.H.'s care. Enrollment was dependent on the outcome of the court intervention.

The State spoke with Mother prior to filing the petition. She reported she had been misdiagnosed with bipolar I disorder at High Plains Mental Health Center (High Plains), where she began mental health treatment at age 11. When she called the State on December 21, 2015, she spoke rapidly and nonstop for approximately 3 minutes. The State filed the present CINC petition the following day and J.C.-G. was placed in protective custody with T.H. and D.H. He remained in their custody throughout the pendency of this case.

On February 25, 2016, the State filed a motion for Mother to obtain a mental examination, expressing concerns about her mental health history as well as recent events. The State reported that between 2006 and 2014, it had filed 6 care and treatment petitions regarding Mother, and records from High Plains indicated she had been hospitalized more than 15 times.

The State had received a report from Sarah Rome-Degenhardt, a shift leader with the City of Hays Emergency Communications Department detailing Mother's contacts with emergency personnel from December 2015 through February 2016. The contacts seemingly demonstrated a deterioration of Mother's mental health. Rome-Degenhardt reported daily abusive, aggressive, and harassing phone calls to the communications department; interference with general emergency services by an increase in frequency and in the abusive nature of the calls; and multiple accusations that HPD, Ellis County Sheriff's Department, Ellis County Attorney's Office, and the call takers were corrupt.

4

Mother accused them of kidnapping, mental abuse, negligence, obstruction, and fraud. Rome-Degenhardt reported Mother usually spoke rapidly and aggressively. Mother made the same allegations about kidnapping to multiple HPD officers and sheriff's deputies during that time.

Raylene Spargo with the Kansas Department of Children and Families (DCF) reported that between December 13, 2015 and February 18, 2016, Mother made 13 reports to DCF about J.C.-G. and her other children. Twelve of the reports were screened out and one was pending. The State met with staff at J.C.-G.'s school who reported that Mother had accused the State, T.H., and others of manslaughter because the increased stress from this case had caused her to lose weight and she was dying of a broken heart. She told school staff that terroristic acts were being committed against her, that Ellis County had triggered her PTSD, and everyone in Ellis County was trying to make her look crazy. She discussed a conspiracy theory regarding the government controlling the weather. She claimed that Hays had triggered a blizzard in Washington D.C. to prevent her from speaking to people in the federal government. Mother had become aggressive with the Ellis County Attorney's Office staff and the clerk of the district court. Due to concerns of Mother's mental health declining, the State requested the district court order a mental health evaluation.

On March 4, 2016, the district court granted the motion, ordering Mother to participate in an evaluation and report of her mental or emotional status or needs. Additionally, the court ordered:

> "From this date forward [Mother] can only communicate in writing to the Ellis County District Court, the Ellis County Clerk of the District Court, the Ellis County Attorney's office, and the Guardian Ad Litem. Further, [Mother] is only permitted to contact Hays PD, Dispatch, and the Ellis County Sheriff's Office in case of true emergency and shall not contact any of the above listed entities for the purpose of discussing this case. IF [MOTHER] VIOLATES ANY OF THESE LIMITED CONTACT ORDERS, SUCH

5

ACTION MAY RESULT IN CONTEMPT OF COURT PROCEEDINGS AGAINST HER."

On April 21, 2016, the State filed a motion to appear and show cause, alleging that Mother had contacted police dispatch 15 times since the limited contact order had been in place. The order to appear and show cause was never served because neighbors reported Mother had gone to Larned.

On June 20, 2016, the district court found that clear and convincing evidence existed that J.C.-G. was a CINC under K.S.A. 38-2202(d)(1) and (2). The court ordered contact between Mother and J.C.-G. to be arranged as soon as possible and all parties were to submit proposed visitation plans within two weeks.

The following day, T.H. testified to the dates and events provided in the petition. She stated that she and D.H. would like to be the permanent placement for J.C.-G. They would be willing to work with any agencies that might be involved for services. T.H. testified Mother had not had any visits with J.C.-G. since he had been placed in T.H.'s custody in December 2015. Because Mother's demeanor was "not nice," T.H. did not answer her calls and did not respond to her text messages. T.H. did not intend on facilitating any visits between Mother and J.C.-G. because of the way Mother had treated her. T.H. stated she had spoken with Spargo of DCF, but no services had been offered because there were no concerns for J.C.-G. while he was placed with her. T.H. explained that some of her concerns for Mother's ability to parent stemmed from her spilling his medications; losing her cell phone, keys, debit card, and J.C.-G.'s seizure helmet; and Mother moving six times in a year, leaving behind personal property with each move.

On August 16, 2016, although the disposition hearing was scheduled, the court determined that it could not proceed with disposition because Mother had not yet obtained a mental health evaluation as had been ordered. The court ordered court services

6

to assist Mother in obtaining her evaluation. It also ordered court services to arrange parenting time between Mother and J.C.-G. for one hour every two weeks. Any costs imposed by Sunflower Family Services for parenting time were to be paid by T.H. The court limited Mother's communication with court services to be only through her attorney. The court ordered Mother and her attorney to submit a parenting plan.

Mother's psychological evaluation was filed with the district court January 13, 2017. On March 7, 2017, Mother filed a permanency plan to work toward reintegration. Two days later, the State filed a motion for a finding of unfitness and termination of parental rights. The State asked the district court to apply the presumption of unfitness in K.S.A. 2017 Supp. 38-2271(a)(3), based on the two previous CINC adjudications.

The termination trial began April 5, 2017. The State's case in chief consisted of testimony of Ann Young, therapist at High Plains, who had treated Mother for 17 years; Todd Koers, therapist at Central Kansas Mental Health (Central Kansas), who began treatment with Mother in March 2016; Nick Stewart, J.C.-G.'s therapist at High Plains; Lori Hertel, licensed therapist who had conducted Mother's psychological evaluation; and T.H. The mental health professionals testified extensively to Mother's inability to understand J.C.-G.'s needs and her history of instability. T.H. testified that despite the order that Mother begin parenting time with J.C.-G., neither Mother nor any agency had contacted her to arrange times. T.H. noted that outside of the psychological evaluation, Mother had only had one visit with J.C.-G., which occurred immediately following the adjudication hearing. She reported that Mother texted her regularly but because the messages were not nice, she stopped replying to them over a year before trial.

During her treatment with Young, Mother received inpatient mental health treatment at Larned at least 32 times. She had received inpatient treatment at Salina Regional Health Center; St. Catherine's in Garden City; Charter Hospital; Prairie View; and University of Kansas Medical Center. Young noted that more recently, Mother's

7

behaviors deteriorated when she was no longer taking her mood stabilizer. Young testified that through the end of her treatment, Mother continued her cyclical behaviors. She struggled with anger and stress, often blaming family and caregivers. She was unable to address her choices or their consequences on her relationships. Mother could be hostile and demanding one minute then expect understanding and privileges the next. In Young's discharge summary she stated that Mother had increased mood issues over the years, including mood fluctuations, intense anger, and irritability. She demonstrated pressured speech, entitlement, and blaming others. Mother had multiple suicide attempts when depressed, multiple hospitalizations, and tended to be more manic than depressed. Mother also struggled with stability. Young's final evaluation was that Mother had bipolar I disorder and other specified personality disorder with mixed personality features. She clarified that Mother did not meet criteria for a specific personality disorder but demonstrated features of some personality disorders. Personality disorders are ingrained patterns of interacting. For Mother, these were her coping mechanisms she had learned to deal with her anxiety.

Young analyzed the 308 pages of writings filed by Mother for the duration of this case. She testified the writings were essentially a written version of what would be expected in the speech of somebody who was in a hypomanic or manic state. The writings demonstrated a pressured, irritable, hostile speech. The patterns of blaming others, grandiosity, sense of entitlement, and lack of insight had been issues Mother demonstrated throughout treatment. Young stated that the writings showed a lack of mood regulation, which was concerning for someone caring for children. She stated someone in that state would struggle to be patient with a child and to put a child's needs above their own. Young expressed that along with the writings, there had been multiple texts, social media posts, and writings that left Mother too distracted to adequately care for a child. Young expressed that although Mother was very nurturing and there was a bond between her and J.C.-G., she could not provide the structure and routine that he required even when she was fully engaged in services. Young expressed her prognosis for

8

significant and sustained reduction in Mother's mental health issues was guarded due to Mother's treatment history, limited insight, and high probability of significant stress from possibly losing custody of J.C.-G. Ultimately, although Mother cares for J.C.-G., she cannot realistically sustain at a level sufficient for his needs for any amount of time.

Koers testified that at Central Kansas, Mother had participated with medication management with the psychiatrist, individual therapy, psychosocial services, and regular case management. Koers diagnosed Mother with depression, borderline personality disorder, and PTSD. The overriding characteristic of borderline personality disorder is intense and unstable relationships, frequent threats of suicide, and self-harm. The doctors at Larned diagnosed her with bipolar disorder in April 2016. Koers reported that when Mother had been unstable, she made frequent trips to the hospital due to depression and suicidal thoughts, and attempted to overdose once. She also demonstrated some manic behaviors and paranoia.

Koers testified that Mother had demonstrated more stability over the 10 months prior to trial. He attributed the stability to her taking all prescribed medications, working with medical staff; and her pregnancy seemed to help her focus. At the time, Mother had one-month-old twin daughters. However, she had been married and divorced. She had met her ex-husband at Larned, and they had known each other for only a couple of months before marrying. He was not very stable and had drug and alcohol issues. Koers testified Mother's tendency toward unstable relationships was consistent with borderline personality disorder.

Koers contended that even if Mother continued with medication and services through the mental health center, while maintaining the level of support she had in the community, his prognosis for long-tern sustainability was still rocky. Her mental health issues would make parenting difficult because of her pattern of intense and unstable relationships across the board, including romantic relationships and relationships with

friends and family, including her children. Mother's stability over a 10-month period was not indicative of long-term stability. He indicated that when a child is attached and removed from a parent repeatedly, it can lead to depression and some personality disorders because of the unstable childhood.

Stewart reported seeing J.C.-G. seven or eight times between 2013 and 2015. Their sessions were very sporadic. At the time, J.C.-G. was five or six years old and often arrived in a stroller, he refused to listen to Mother, and would throw screaming fits. Although J.C.-G. demonstrated some spectrum-related issues, he also appeared to be incredibly developmentally delayed. He was nonverbal when he began therapy. He often grunted instead of speaking. Stewart opined that many of his issues were rooted in nurture over nature. Mother was motivated, but she had little tolerance for J.C.-G.'s aggressive outbursts, which often ended with her restraining him.

Stewart discussed the marked improvement in J.C.-G. since he had been placed with T.H. They began therapy again in January 2016 and J.C.-G. had already made progress. He walked on his own, responded to adult directives, and could be redirected when distracted. Stewart opined that J.C.-G.'s improvement was rooted in the structure with T.H. He believed that returning him to Mother's care could lead to regression. Considering Mother's mental health issues and her struggle to cope with stress, Stewart reported he would be concerned that J.C.-G.'s emotional, physical, and other needs would not be met if he returned to Mother.

Hertel concluded that Mother had low average general intellectual abilities. Because she processed incoming information slowly but had a high verbal IQ, she tended to speak before processing incoming information. She generally viewed people as being negative and had lost friends because she had not understood her own limitations or how to respond to friends. Hertel reported she had observed some psychotic features during

10

the evaluation, specifically, some delusions, disorganization, disordered thinking, difficulty concentrating, feelings of suspicion, and distorted perceptions.

Hertel opined that Mother required education about child development and abilities. She had observed two visits between Mother and J.C.-G. J.C.-G. ran to Mother and gave her a big hug. It was difficult for him to detach. Hertel noted she had not expected such a complete attachment. Mother had been educational and very involved. In the first visit, J.C.-G. had been overstimulated, and Hertel asked Mother to avoid doing that again. However, during the second visit, they played the same game and he was overstimulated again. Mother did not appear to understand J.C.-G.'s limitations or that she needed to slow down her activities to avoid overstimulating him. Mother tried hard to help him with his special needs, but she did not understand that he was overexcited.

Hertel noted that Mother had participated in many services but did not seem to have benefitted from them at that point. She was concerned about Mother parenting twins while caring for J.C.-G., whose needs she did not understand. She opined that Mother could not adequately take care of J.C.-G. for a sustained period of time, and would likely continue her patterns of behavior. Despite Mother's stability for 10 months, Hertel's opinion had not changed, as she did not believe it was an indicator for long-term abilities.

The State submitted the petitions and no contest statements from the 2009 and 2014 CINC cases and requested that the district court apply the presumption of unfitness in K.S.A. 2017 Supp. 38-2271(a)(3). The State noted the previous CINC adjudications were a result of Mother's psychiatric instability and the current case was history repeating itself. It argued the facts of the past cases were similar to those here and so the cases were probative to the current situation.

Mother argued against the use of such presumption based on the findings in *In re J.L.*, 20 Kan. App. 2d 665, 891 P.2d 1125 (1995). She argued the district court should

11

consider the lapse in time between the cases as the court did in *In re J.L.* Mother argued the court should consider Koers' testimony about her stability since she had moved to Salina and should hear her case before determining whether to apply the presumption.

Ultimately, the district court applied the presumption, finding that J.C.-G. had been adjudicated as a CINC two times before and that was a K.S.A. 60-414(a) presumption as it was based on facts that were relevant and probative to Mother's current unfitness. The court considered the seven factors listed in *In re J.L.*, 20 Kan. App. 2d. at 681. Under the first factor, the passage of time, the court found that the lapse in time between the two previous cases and this case was not so great that they had become irrelevant. Under the second factor, the court considered the fact that all three cases were for the care of J.C.-G. The third factor did not apply to Mother's case. Under the fourth factor, the court found the facts of the previous adjudications were exactly the same as the facts in the present case. The fifth factor was satisfied because the facts of all three cases were the same. Under factors six and seven, the court found that Mother had access to the evidence relating to unfitness and requiring her to go forward with evidence to rebut the presumption was not unfair as she had adequate notice of evidence presented.

Mother called two witnesses. Lou Ann Brungardt, who had known Mother for 20 years, testified she believed Mother was a fit parent. Brungardt stated she had provided emotional support and motherly advice to Mother through her highs and lows. Brungardt had only observed Mother with J.C.-G. a few times but believed her to be appropriate. She noted Mother's maturity in the 6 months prior to trial and believed support through Mother's church would prevent her from continuing the cyclical behaviors.

Rhonda Brunner, the bishop's wife at the Church of Jesus Christ of Latter-day Saints, where Mother attended in Salina, testified. She agreed that Mother had been very functional over the previous six months and had been focused on getting everything in order for court and for her infant twin daughters. Brunner had extensive history working

12

with children with special needs, and she would be a support for Mother and would help with J.C.-G. if he were returned to Mother.

Mother contends this case began because of her rough past and some of the issues she had while she lived in Hays. She felt like she was often judged and no one in Hays believed her. She viewed her move to Salina as a necessary fresh start because there were too many triggers in Hays and she had reached her breaking point. She stated her support system in Salina consisted of her church congregation, former coworkers, and some friends she made while riding the bus, including one of the bus drivers. She insisted that with such a supportive group of people ready to help her, she would avoid the cycle of behaviors she had experienced in the past.

Mother discussed her hospitalization at Larned approximately five months after moving to Salina. She reported she had self-harming thoughts because she felt like she could not escape her past; however, she had no intentions of following through. She reported that prior to her admission, she had experienced a flashback during the screening process. The hospitalization was her way of reaching out and getting the help she needed. She reported she was involuntarily committed because she knew that was the only way to receive immediate treatment. With voluntary commitment, she may have had to wait for bed space or they could have sent her to a different hospital. She stated her medications were working correctly and she had a strong support system. Mother was confident she was able to recognize symptoms when they started and would be able to seek help before they became too much for her to handle.

Mother testified that many of the medication issues for J.C.-G. revolved around T.H.'s irresponsibility with the medications. She reported T.H. had caused J.C.-G. to go without medications when he was with Mother because T.H. had kept them instead of providing them for Mother. Mother struggled with being blamed for any of J.C.-G.'s issues and contended they were a result of his mental health conditions. She testified

13

T.H.'s dishonesty had caused her much anxiety. She stated she had taken classes that would help her better care for J.C.-G. and she had been participating in services with the child advocacy and parenting services in Salina.

The district court found there was no doubt that Mother loved J.C.-G., but that was not the issue in the case. The court pointed out the facts presented that weighed heavily in its decision-making. It placed great emphasis on Young's testimony regarding Mother's extensive mental health history and Young's guarded prognosis based on the history as well as her analysis of Mother's writings filed with the court. The court noted the concerns that Mother would not be able to put a child's needs above her own and that the cyclical behaviors had continued. The court discussed the lack of accountability, noting that Mother had blamed her own mother, T.H., the men in her life, and her therapists while not accepting any responsibility for her actions. This observation was supported by Young's testimony and Mother's diagnoses. The court did not view the recent stability as an indicator of long-term stability, but agreed with Young that the entire 18 years of treatment was a more persuasive indicator.

The district court noted that even Mother's current therapist doubted her ability to parent a special needs child. Koers testified his prognosis was "on the rocky side" in that it would be very difficult for Mother to parent. He also did not view the most recent stability as a good predictor for future behavior.

From T.H.'s testimony, the district court focused on the fact that Mother had only one visit with J.C.-G. since December 2015. The court noted that J.C.-G. had made much progress since he had been placed with T.H. and Mother had little tolerance for his problems. The court emphasized Stewart's testimony that returning to Mother would likely lead to regression for J.C.-G. The court considered Hertel's testimony that Mother would not be capable of caring for J.C.-G. long term.

14

The district court noted it had applied the presumption of unfitness and Mother had not rebutted the presumption by a preponderance of the evidence. The court stated that in case the Court of Appeals found error in application of the presumption, the State had established by clear and convincing evidence that Mother was unfit to parent under K.S.A. 2017 Supp. 38-2269(b)(1), (b)(9), and (c)(2). The court found that under K.S.A. 2017 Supp. 38-2269(g)(1), the best interests of J.C.-G. were served in terminating Mother's parental rights.

Mother appeals.

*Constitutional Challenge to Notice*

We first consider whether Mother properly preserved the constitutional challenge to notice as to use of the presumption of unfitness.

*Standard of Review*

Constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 729, 317 P.3d 70 (2014).

*Discussion*

Mother failed to object to the use of the presumption of unfitness at the district court level. While she argued that the right to parent a child is a right under the Fourteenth Amendment of the United States Constitution, such argument is a blanket statement to note the significance courts have placed on that right. It is not specific

15

enough to adequately preserve the issue of the district court's failure to warn for appellate review.

Supreme Court Rule 6.02(a)(5) (2018 Kan. Ct. R. 34.) requires an appellant who raises a constitutional issue for the first time on appeal to affirmatively invoke and argue an exception to the rule. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Here, Mother has failed to argue that an exception applies that warrants appellate review. The *Godfrey* court noted that litigants have no excuse for noncompliance with Rule 6.02(a)(5). This issue has been abandoned. See 301 Kan. at 1044.

*Presumption of Unfitness*

We next consider whether the district court violated Mother's constitutional rights by applying the presumption of unfitness.

Mother contends that the presumption, as applied, was unconstitutional. Under K.S.A. 2017 Supp. 38-2271,

> "(a) It is presumed in the manner provided in K.S.A. 60-414, and amendments thereto, that a parent is unfit by reason of conduct or condition which renders the parent unable to fully care for a child, if the state establishes, by clear and convincing evidence, that:
> . . . .
> (3) on two or more prior occasions a child in the physical custody of the parent has been adjudicated a child in need of care as defined by K.S.A. 2017 Supp. 38-2202(d)(1), (d)(3),
> "(d)(5), or (d)(11), and amendments thereto, or comparable proceedings under the laws of another jurisdiction."

In the previous cases, J.C.-G. was adjudicated a CINC under K.S.A. 2017 Supp. 38-2202(d)(1), (2), and (3), which state:

16

"(d) 'Child in need of care' means a person less than 18 years of age at the time of filing of the petition or issuance of an ex parte protective order pursuant to K.S.A. 2017 Supp. 38-2242, and amendments thereto, who:

(1) Is without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian;

(2) is without the care or control necessary for the child's physical, mental or emotional health;

(3) has been physically, mentally or emotionally abused or neglected or sexually abused."

Prior to entering stipulations, the district court is required to review a set of questions, set out in K.S.A. 2017 Supp. 38-2248(b)(1)-(5), with the party. However, the statute does not require the court to provide notice that entering a no contest statement could result in application of a presumption of unfitness in later proceedings. Mother contends that applying the presumption of unfitness based on prior CINC adjudications essentially turns her no contest statements into waivers of her constitutional right to custody and control of her child. She uses *Brady v. United States*, 397 U.S. 742, 748, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970), and *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), as examples of the court requiring notice of the potential jeopardy to an individual's constitutional rights prior to waiving such rights. It seems that Mother is arguing that the failure to provide sufficient notice is a procedural due process violation.

*Standard of Review*

The Fourteenth Amendment protects individuals from government deprivation of "life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Winston v. Kansas Dept. of SRS*, 274 Kan.

17

396, 409-410, 49 P.3d 1274 (2002) (citing *Kennedy v. Board of Shawnee County Comm'rs*, 264 Kan. 776, 797-98, 958 P.2d 637 [1998]). In reviewing a procedural due process claim, we must first determine whether a constitutionally protected liberty or property interest is involved. 274 Kan. at 409. If so, we must then determine the nature and extent of the process due to the individual. 274 Kan. at 409. Mother must establish that she was denied a specific procedural protection to which she was entitled. 274 Kan. at 409.

*Discussion*

Kansas courts have recognized the fundamental constitutional right of parents to the custody and control of their children. *In re Guardianship of Williams*, 254 Kan. 814, 819-20, 869 P.2d 661 (1994); *In re Brooks*, 228 Kan. 541, 548, 618 P.2d 814 (1980); *In re J.L.*, 20 Kan. App. 2d 665, 670, 891 P.2d 1125 *rev. denied* 257 Kan. 1092 (1995). However, the right to parent is not unlimited, as demonstrated through the multitude of parental termination cases. *State v. Liebau*, 31 Kan. App. 2d 501, 506, 67 P.3d 156 (2003). Because the right to parent is a fundamental right, the court must then determine the nature and extent of the process due to Mother.

Mother's assertion that her right to parent J.C.-G. was unconstitutionally violated by use of the presumption of unfitness is flawed. First, she contends that nothing in the record indicates that she had been provided notice that the prior CINC cases could result in the presumption of unfitness in subsequent CINC cases. Even if we were to determine that such a requirement existed, the district court in the previous two cases would have had to provide the notice, making this claim an attempt to remedy alleged procedural issues in the two previous cases. If such a notice requirement existed, the notices would have been provided along with the K.S.A. 2017 Supp. 38-2248(b)(1)-(5) questions prior to accepting the no contest statements in those cases. Even if this were an appropriate argument in this case, the burden to designate facts in the record is on the party making

the claim; without such a record, the claim of error fails. *Freidman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013). While Mother asserts there is an absence of such notice in the record, she has failed to present a record to demonstrate that she had not received notice in the previous cases to the district court.

No requirement for such a warning exists. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015). Here, the only authority presented was a comparison to *Miranda* warnings and pleas under *Brady*. However, Mother has provided no analysis beyond asserting that courts have required notification before waiving constitutional rights. The no contest statements here are more comparable to a defendant entering a guilty plea and, therefore waiving his or her right to trial, as addressed in *Brady*, than waiving *Miranda* rights.

In *Brady*, the Supreme Court determined that prior to accepting a guilty plea, a court must find that it is made voluntarily and knowingly. 397 U.S. at 755-56. Voluntariness requires awareness of the direct consequences. 397 U.S. at 755. Similarly, under K.S.A. 2017 Supp. 38-2248(d), before adjudication on a no contest statement in a CINC case, the court must have ensured that Mother understood her rights by asking the questions outlined in K.S.A. 2017 Supp. 38-2248(b). Mother's assertion that she required notice of the previous cases' effect on this case is asking for more notice than required in *Brady*, as *Brady* only requires notice of direct consequences. With guilty pleas, once a court has determined the plea was voluntary and knowing, a factual basis to support the conviction must be presented prior to the court accepting the plea, thereby allowing a defendant to waive her right to trial. Before adjudication on a no contest statement, the court must find that a factual basis to support the findings existed. K.S.A. 2017 Supp. 22-3210(a)(4); K.S.A. 2017 Supp. 38-2248(d). Once that is satisfied, the court may accept the no contest statement, thereby waiving trial rights. Mother's comparison to *Brady* is

19

accurate; however, by abiding by the statutory scheme for CINC adjudications, Mother received the same assurances that her no contest statements were voluntarily and knowingly made and supported by a factual basis.

Importantly, application of the presumption did not conclude the case. Mother was given the opportunity to rebut the presumption by showing, by a preponderance of the evidence, which is a showing that it is more likely than not, that she was fit and able to care for J.C.-G. or would have been in the foreseeable future. K.S.A. 2017 Supp. 38-2271(b); *C.M. v. McKee*, 54 Kan. App. 2d 318, 322, 398 P.3d 228 (2017). In her argument against application of the presumption, Mother asked the court to wait until after she presented her evidence before determining if the presumption applied. She clarified that application of the presumption would not have affected her evidence. She intended on presenting the same case with or without the presumption. Ultimately, the presumption had no effect on the outcome of the case. It did not affect her case and the district court found the State had presented clear and convincing evidence that Mother was unfit to parent J.C.-G.

This court has previously held that use of the presumption of unfitness is constitutional when the district court determines the appropriate presumption in K.S.A. 60-414. *In re J.S.*, 42 Kan. App. 2d 113, Syl. ¶ 1, 208 P.3d 802 (2009). Here, the district court found that the presumption of unfitness was a K.S.A. 60-414(a) presumption. Therefore, each statutory requirement was satisfied for use of the presumption of unfitness and the application was constitutional.

*Abuse of Discretion*

We next consider if the district court abused its discretion by placing J.C.-G in T.H.'s custody instead of DCF's custody.

20

Mother asserts that the district court abused its discretion by placing J.C.-G. in T.H.'s custody instead of DCF's custody. She claims the court never ordered visitations between Mother and J.C.-G. other than one visit after adjudication. She asserts that had J.C.-G. been in DCF's custody, she would have had access to more resources which could have assisted in reintegration. She contends that placement in DCF custody is customary in the majority of CINC cases.

*Standard of Review*

A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) is based on an error of law; or (3) is based on an error lf fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). Mother contends that no reasonable person would take the view adopted by the district court, as she asserts no error of law or fact.

*Discussion*

The State asserts that direct placement is supported by the Revised Kansas Code for Care of Children. K.S.A. 2017 Supp. 38-2242(c)(1)(B) permits placement in the protective custody of a person, other than a parent, who shall not be required to be licensed when the court orders protective custody at the outset of the proceedings. The same custody order is permitted under K.S.A. 2017 Supp. 38-2243(g)(1)(B) for an order of temporary custody through the pendency of the case. Under K.S.A. 2017 Supp. 38-2255(d), the court may award custody to a person with close emotional ties with the child. The court had the authority to place J.C.-G. in T.H.'s custody throughout the case.

The question is whether a reasonable person would have placed J.C.-G. in T.H.'s custody throughout this case. T.H., Mother, and J.C.-G. were already known to the court because T.H. was the placement for J.C.-G. during the 2014 CINC case. In July 2015, the

21

State dismissed the third CINC petition, filed in May 2015, after Mother and T.H. convinced the State that they could co-parent J.C.-G. Here, the petition provided a list of the dates during which J.C.-G. had stayed with T.H. since T.H. and Mother met in January 2014. Because T.H. had been a source of stability for J.C.-G., taking him in whenever Mother needed her to for almost two years before this petition was filed, a reasonable person would have placed J.C.-G. in her custody upon finding that a need for protective custody existed.

Mother asserts it was unreasonable that the district court continued placement in T.H.'s custody throughout the case because it limited the resources and visitations between Mother and J.C.-G. Two months after the beginning of the case, the State filed a motion for a mental examination due to Mother's behaviors. The court ordered a psychological evaluation and ordered only limited contact with the Ellis County District Court, Ellis County Clerk of the District Court, Ellis County Attorney's Office, guardian ad litem, Hays Police Department, Dispatch, and the Ellis County Sheriff's Office. It was reasonable that no visitation was granted due to concerns of Mother's mental health.

On June 20, 2016, following the adjudication hearing, the district court ordered that contacts between Mother and J.C.-G. were to begin as soon as could be reasonably arranged. Mother had a visit with J.C.-G. after that hearing. The court ordered the parties to submit a proposed visitation plan within two weeks. No visitation plan was provided.

The disposition hearing had to be continued because Mother had not yet obtained a psychological evaluation. The district court ordered court services to facilitate Mother obtaining the evaluation and to arrange parenting time for 1 hour every 2 weeks. T.H. later testified she had never been contacted by anybody to arrange parenting time as ordered by the court. Mother never contested this assertion.

22

Mother claims that in the 2009 and 2014 cases she had been able to participate in permanency planning and successfully reintegrate J.C.-G. into her home because he had been placed in DCF custody. She contends that no efforts were made for reintegration here. Mother alleges that because no permanency plan was in place, she did not have the option to have visits with J.C.-G. As noted above, the court ordered visits and even ordered court services to assist in arranging them. However, Mother failed to follow through. The State accurately presents that under K.S.A. 2017 Supp. 38-2266(a), the court was not obligated to require reasonable efforts to reintegrate J.C.-G. Given the numerous concerns for Mother's stability throughout the pendency of this case, it was reasonable that no further efforts were made toward reintegration. Her lack of participation prevented the effectiveness of any services ordered.

Because Mother has failed to show that any resources were lacking as a result of J.C.-G. being placed in T.H.'s custody rather than DCF custody, she has failed to show the custody order was unreasonable. The district court ordered resources to assist with parenting time, but Mother failed to follow through. A parent's participation often dictates the direction of these cases, as seen in the previous cases in which Mother actively participated to regain custody of J.C.-G. Throughout this and the two previous CINC cases, T.H. demonstrated her flexibility and willingness to adhere to court orders and provide positive support for J.C.-G. She had consistently been a placement for him, within months of meeting Mother. It is reasonable that the court placed J.C.-G. in T.H.'s custody.

*Sufficiency of the Evidence*

We also must determine if the State failed to provide sufficient evidence that Mother was an unfit parent.

Mother asserts the district court must have found that she was unfit to parent before making a determination to terminate her parental rights. The factors for consideration of unfitness are provided in K.S.A. 2017 Supp. 38-2269(b)(1)-(9) and for children who are placed out of the home, K.S.A. 2017 Supp. 38-2269(c)(1)-(4). The court must find the State has shown by clear and convincing evidence that Mother was unfit and was unlikely to become fit in the foreseeable future. Mother contends the State failed to provide sufficient evidence because the court only found evidence sufficient to justify termination under K.S.A. 2017 Supp. 38-2269(b)(1), (b)(9), and (c)(2).

*Standard of Review*

The Kansas Legislature has specified that the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2017 Supp. 38-2250. In addition to child in need of care adjudications, the clear and convincing evidence standard of proof applies to all termination of parental rights cases. K.S.A. 2017 Supp. 38-2269(a).

"When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.* by clear and convincing evidence, that the parent's right should be terminated. [Citation omitted]." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

*Discussion*

The district court found the State had shown by clear and convincing evidence that Mother was an unfit parent under the following three subsections of K.S.A. 2017 Supp. 38-2269:

> "(b) In making a determination of unfitness the court shall consider, but is not limited to the following, if applicable:
>
> "(1) Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child;
>
> . . . .
>
> (9) whether the child has been in extended out of home placement as a result of actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply.
>
> "(c) In addition to the foregoing, when a child is not in the physical custody of a parent, the court, shall consider, but is not limited to, the following:
>
> . . . .
>
> (2) failure to maintain regular visitation, contact or communication with the child or with the custodian of the child;"

While Mother minimizes the number of factors considered by the court in terminating her parental rights, "[p]roof of any one of these factors may establish grounds for termination of parental rights." *In Interest of D.H.*, 54 Kan. App. 2d 486, 488, 401 P.3d 163 (2017) (citing K.S.A. 2017 Supp. 38-2269[f]).

Mother's contention that visitation had not been ordered fails, because of the two court orders for visitation and resources put in place to ensure visitation. T.H. testified that court services, Sunflower Family Services, and Mother had never contacted her to arrange visits. While she testified that Mother regularly texted her, she noted that Mother had never asked to see J.C.-G. Mother did not produce any evidence to the contrary.

25

Regarding the findings under K.S.A. 2017 Supp. 38-2269(b)(1), Mother contends she was never provided the opportunity to resolve the concerns for her mental health by working with a social worker to rehabilitate herself or work on reintegration. She minimizes the district court's finding by stating that it relied on speculation by her previous and current mental health providers. By stating that progress in her mental health could improve through working with a social worker, she fails to recognize reintegration in the previous CINC cases was achieved through her cooperation with mental health services through High Plains, not by working with a social worker. Through her cooperation with High Plains, Mother stabilized and J.C.-G. was able to reintegrate. Through Central Kansas, Mother had participated in medication management with the psychiatrist, individual therapy with Koers, psychosocial services, and regular case management. Sufficient mental health services were available. Testimony also supported the findings that Mother's years of mental health services outweighed the recent months of stability.

The testimony provided more than mere speculation as to Mother's abilities and stability. The testimony covered approximately 19 years of treatment. As stated above, the mental health professionals testified extensively to Mother's inability to understand J.C.-G.'s needs and her history of instability. The duration of Mother's mental illness was shown to have been at least 19 years, with continued cycles and little improvement overall. Having testimony that reflect Mother's mental health concerns over most of her life, the issue was not a question of her desire to parent J.C.-G., but a question of whether her mental illness would permit her to care for J.C.-G.'s ongoing needs. The mental health professionals' testimony was sufficient to show that despite temporary stability, Mother's cyclical behaviors were likely to continue. The consensus was that even at her best, Mother was not capable of providing the care required for a child with J.C.-G.'s needs. There was no doubt that she loved her son and they were bonded. The concern was that absent routine and consistency, J.C.-G would regress. The State has shown by clear

26

and convincing evidence that Mother is an unfit parent and properly terminated her parental rights.

Affirmed.